UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO: 3:16-CV-00451-GNS

RAHEEL FOODS, LLC, ET AL.                                                              PLAINTIFFS

v.

YUM! BRANDS, INC., ET AL.                                                              DEFENDANTS

## MEMORANDUM OPINION & ORDER

This matter is before the Court upon Defendants' Renewed Motion to Dismiss for Failure to State a Claim (DN 32), which is ripe for adjudication. For the reasons stated below, it is **GRANTED IN PART** and **DENIED IN PART**.

### I.     STATEMENT OF FACTS

Syed Raheel ("Raheel") originally filed this action in his own name against Yum! Brands, Inc. ("Yum") in Los Angeles Superior Court. (Notice of Removal Ex. A, at 12, DN 1). On January 13, 2016, Raheel amended the Complaint to add KFC Corporation ("KFC"), Taco Bell Corporation, and Pizza Hut, Inc. as defendants. (Notice of Removal Ex. B, at 33). Subsequently, he amended the First Amended Complaint to remove Taco Bell Corporation and Pizza Hut, Inc., withdraw as Plaintiff, and add Raheel Foods, LLC; Raheel Foods 2 Inc.; Raheel Realty, Inc.; and Raheel Realty, LLC as Plaintiffs. (Notice of Removal Ex. N, at 103-04, DN 1-1 [hereinafter 2d Am. Compl.]).

Raheel Foods, LLC ("Raheel Foods FL") is a Florida limited liability company that owned Long John Silver's franchises in Florida. (2d Am. Compl. ¶ 8). Raheel Foods 2, Inc. ("Raheel Foods 2 IL") is an Illinois corporation that owned Long John Silver's and A&W

franchises and operated those stores in Illinois, Wisconsin, and Indiana. (2d Am. Compl. ¶ 9). Raheel Foods FL and Raheel Foods 2 IL are referred to collectively as "Raheel Foods." Additionally, several Yum franchises, including KFC restaurants, were owned by Raheel Foods entities that are not parties to this case (collectively, "Non-Party Raheel Foods"). (2d Am. Compl. ¶ 2).

Raheel Realty, Inc. ("Raheel Realty AR") is an Arkansas corporation that owned the real property upon which two unspecified franchises were located. (2d Am. Compl. ¶ 10). Raheel Realty, LLC ("Raheel Realty IL") is an Illinois limited liability company that owned the real property upon which fourteen unspecified franchises were located. (2d Am. Compl. ¶ 11). Raheel Realty AR and Raheel Realty IL are referred to collectively as "Raheel Realty." Together, Raheel Foods and Raheel Realty are referred to as "Plaintiffs."

According to the Second Amended Complaint, Raheel entered into franchise agreements with Defendants for certain stores in 1994. (2d Am. Compl. ¶ 12). Initially, Raheel was the approved franchisee and contracting party with Defendants. (2d Am. Compl. ¶ 12). Over time, however, Raheel established distinct business entities, including those listed above. (2d Am. Compl. ¶ 12). With Defendants' consent, Raheel transferred all of the franchises at issue to the Raheel Food entities, which made those entities the franchisees, and Raheel apparently remained involved as Raheel Foods' approved "Control Person," defined as the person who directs the business affairs of the corporate franchisee. (2d Am. Compl. ¶¶ 12-13).

In 2008, Raheel Foods, Non-Party Raheel Foods, and Raheel Realty began a quest to sell their franchises and the underlying real estate. (2d Am. Compl. ¶ 24). Plaintiffs allege they were able to find qualified buyers willing to purchase all stores owned by Raheel Foods and Non-Party Raheel Foods, as well as the underlying real estate, as a package deal. (2d Am. Compl. ¶

2

24). Pursuant to the terms of the franchise agreements and Defendants' standard operating procedure, however, a franchisee is required to obtain two levels of approval before it can sell its franchise: Defendants must approve the potential purchaser as a franchisee and must also approve the deal as a whole. (2d Am. Compl. ¶ 4). Plaintiffs allege that Defendants routinely approved franchise sales, especially when the proposed purchaser was already approved as a Yum franchisee—which was the case here with two of the potential purchasers. (2d Am. Compl. ¶¶ 5, 31, 42).

From 2009 and 2012, Raheel Foods and Non-Party Raheel Foods submitted at least ten prospective buyers to Yum, Long John Silver's, and KFC for approval. (2d Am. Compl. ¶ 28). At least four of these purchasers engaged in extensive negotiations with Raheel Foods, Non-Party Raheel Foods, and Raheel Realty. (2d Am. Compl. ¶ 28). According to Plaintiffs, instead of giving genuine consideration to the proposed sales, Defendants denied the deals and diverted those four buyers by either selling them corporate-owned stores at a discount or refusing to approve the buyers as franchisees when submitted by Plaintiffs, but later approving them for purchase of their own stores. (2d Am. Compl. ¶¶ 6, 28-46). Plaintiffs allege that Yum was informed of, and actively involved in, the approval process. They further claim that Yum's Vice-President of Franchise Recruiting took an active role in screening proposed purchasers and, in collaboration with KFC, diverted Plaintiffs' proposed purchasers. (2d Am. Compl. ¶ 25).

Plaintiffs describe the circumstances surrounding the transactions in the Second Amended Complaint. (2d Am. Compl. ¶¶ 31-44). For example, Plaintiffs allege that one potential purchaser, J.A., made an offer to purchase all franchises owned by Raheel Foods and Non-Party Raheel Foods, as well as the underlying real estate for nineteen of the properties. (2d Am. Compl. ¶ 31). Apparently, J.A was already approved as a Yum franchisee and, around July

2010, Defendants approved the sale. (2d Am. Compl. ¶ 31). In May 2011, however, Defendants withdrew their approval and instructed Non-Party Raheel Foods to terminate their contract with J.A. (2d Am. Compl. ¶ 32). Plaintiffs allege that because the sale of Raheel Foods franchises and the underlying real estate was contingent on approval of the entire sales package—including Non-Party Raheel Foods' KFC stores—Raheel Foods and Raheel Realty were also forced to stop communicating with J.A. (2d Am. Compl. ¶ 32). Sometime between January 2011 and October 2011, however, Defendants offered J.A. seventy of their corporate-owned stores and eleven underlying properties at a substantial discount. J.A. accepted the offer in December 2011. (2d Am. Compl. ¶ 33).

Based upon these facts, Plaintiffs assert the following claims: (1) intentional interference with prospective economic advantage; (2) negligent interference with prospective economic advantage; and (3) unfair competition based on Kentucky common law and California Business & Professions Code Section 17200 (the "UCL"). Plaintiffs also ask the Court to pierce the corporate veil of KFC and hold Yum liable on alter-ego grounds.

On April 27, 2016, Defendants removed this case to the United States District Court for the Central District of California and subsequently moved to dismiss the Second Amended Complaint on the pleadings under Fed. R. Civ. P. 12(b)(6). (Notice of Removal 1; Defs.' Mot. Dismiss, DN 10). Defendants then moved to transfer venue to the Western District of Kentucky, which Plaintiffs did not oppose. (Defs.' Mot. Transfer, DN 14). Judge R. Gary Klausner of the Central District of California granted Defendants' motion to transfer on July 12, 2016, and held that Defendants' Motion to Dismiss was moot. (Order, DN-20). Defendants have now renewed that motion. (Defs.' Renewed Mot. Dismiss, DN 32).

## II. JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship between the parties and the amount in controversy exceeds §75,000, exclusive of interest and costs.

## III. STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and is subject to dismissal if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P 12(b)(6). When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983)). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Traverse Bay Area Intermediate Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## IV. DISCUSSION

### A. Choice of Law

Given that this is a diversity case that began in California, it must first determine what law applies. When parties acquiesce to the application of a particular state's law, courts need not

address choice of law questions. *In re Korean Air Lines Disaster*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) ("Unlike jurisdictional issues, courts need not address choice of law questions *sua sponte*."); *see also GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998) (citing *In re Korean Air Lines Disaster*, 932 F.2d at 1495). While the parties analyze their claims under both California and Kentucky law, they concede that Kentucky law applies. (Pls.' Opp'n Defs.' Renewed Mot. Dismiss 23-24, DN 39 [hereinafter Pls.' Opp'n]; Defs.' Mem. Supp. Renewed Mot. Dismiss 6 n.1, DN 40). Therefore, the Court will apply Kentucky law.

### B. Plaintiffs' Claims

#### 1. *Intentional Interference with Prospective Economic Advantage*

Under Kentucky law, liability for the intentional inference with a prospective economic advantage arises when a party improperly interferes with another's valid business expectancy. *See Nat'l Collegiate Athletic Ass'n ex rel. Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1998). In *Hornung*, the Kentucky Supreme Court adopted Sections 766, 767, and 773 of the Restatement (Second) of Torts as the applicable law. *Id.* Section 766B sets forth the basic elements of the tort:

> One who *intentionally* and *improperly* interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (emphasis added).

Section 767 provides factors to determine whether interference is improper within the meaning of Section 766B.[1] In considering these factors and relevant case law, the Kentucky

---

[1] Section 767 of the Restatement (Second) of Torts states, in relevant part:

6

Supreme Court has held that that improper interference under Section 766B requires the plaintiff to "show malice or some significantly wrongful conduct." *Hornung*, 754 S.W.2d at 859; *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991) (noting that interference is not improper unless it "[i]t is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion."); *AMC of Louisville, Inc. v. Cincinnati Milacron, Inc.*, No. 3:97-CV-343-H, 2000 WL 33975582, at *6 (W.D. Ky. Jan. 2000) ("If a plaintiff fails to show "bad-faith, illegitimate motive or unlawful or wrongful conduct, there is no tortious interference.").

A party can act with malice in the absence of "ill will"; indeed, "malice may be inferred in an interference action by proof of lack of justification." *Hornung*, 754 S.W.2d at 859 (citing *Smith Dev. Corp. v. Bilow Enter., Inc.*, 308 A.2d 477 (R.I. 1973); Restatement (Second) of Torts § 766 cmt. s ("[T]he context and the course of the decisions make it clear that what is meant is not malice in the sense of ill will but merely 'intentional interference without justification.'")). Moreover, as one court has noted, "the real question is whether the actor's conduct was fair and reasonable under the circumstances." *Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 621 (W.D. Ky. 2009) (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 767 cmt. j.). In determining whether a defendant's conduct was fair and reasonable, "[p]ertinent factors include recognized standards of business ethics and business

---

> In determining whether an actor's conduct in intentionally interfering with . . . a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

7

customs and practice, the concepts of fair play, and rules of the game." *Id.* (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 767 cmt. j.).

If the parties are competitors, Section 768 of the Restatement (Second) of Torts provides further guidance on whether interference is improper. It states, in relevant part:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor . . . does not interfere improperly with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other.

Overall, Section 768 makes clear that "competition is not an improper basis for interference." *Id.* § 768, cmt. (a). While the Kentucky Supreme Court has not considered whether to apply Section 768 in cases involving competitors, the Sixth Circuit and district courts within it have held that Kentucky law would look to Section 768 in cases between competitors. *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 309 (6th Cir. 2011) (collecting cases). That is not to say, however, that Section 767 becomes irrelevant when competitors are involved. In *Ventas*, the Sixth Circuit held that "[i]n seeking guidance, the district court properly looked to § 767, as many other courts have done, to illuminate the meaning of "wrongful" conduct under § 768." *Id.* at 310 (citations omitted).

Plaintiffs allege that Raheel Foods, Non-Party Raheel Foods, and Raheel Realty presented their proposed purchasers to Defendants for approval as required by the franchise agreements. As a result, the identities of the proposed purchasers and the terms of the package deals were disclosed to Defendants. Plaintiffs also allege that Defendants routinely approved franchise sales, especially when the proposed purchaser was already approved as a franchisee— which was the case with two of the potential purchasers here. Rather than genuinely considering

8

the sales, however, it is alleged that Defendants undercut Plaintiffs by offering their proposed purchasers corporate-owned stores at below-market prices or refusing to approve proposed purchasers as franchisees when presented by Plaintiffs, but later approving them to purchase corporate-owned stores. Considering Plaintiffs' allegations as true, Defendants' conduct could potentially violate "concepts of fair play" and the "rules of the game."

Defendants argue that they had the right to deny any sale proposed by Non-Party Raheel Foods and thus their denial cannot be improper interference. Kentucky courts and federal courts alike have recognized that the exercise of legitimate contract rights cannot give rise to an intentional interference claim. *See, e.g.*, *Hornung*, 754 S.W.2d at 860; *Blair v. Gen. Motors Corp.*, 838 F. Supp. 1196, 1200-01 (W.D. Ky. 1993); *Hunt Enters. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 703 (W.D. Ky. 1997); *Epps Chevrolet Co. v. Nissan N. Am., Inc.*, 99 F. Supp. 3d 692, 704 (E.D. Ky. 2015).

In *Hornung*, a television network had a contract with the NCAA to broadcast a series of college football games. *Hornung*, 754 S.W.2d at 856. The contract gave the NCAA the right to approve or disapprove any announcer used on the broadcast. *Id.* The network submitted the plaintiff's name, but the NCCA did not approve him. *Id.* at 856-57. Subsequently, the plaintiff sued the NCAA for intentional interference with prospective economic advantage. *Id.* at 855. In overturning a jury verdict for the plaintiff, the Kentucky Supreme Court recognized that the NCAA was entitled to exercise its approval right in good faith, even if doing so was to the detriment of the plaintiff's prospective contractual relation with the network. *Id.* at 859-60.

Similarly, in *Blair*, a car dealer entered into an agreement for the sale of its dealership contingent on General Motor's approval. *Blair*, 838 F. Supp. at 1200. General Motors refused to approve the sale, and the prospective buyer brought suit for tortious interference. *Id.* The

9

court held that "[a] claim for tortious interference should not be where [a defendant] is asserting legitimate contract rights." *Id.* Moreover, the court noted that the plaintiff failed to point to "[a] single wrongful motive or reason to account for Defendants' exercise of its written contractual rights." *Id.* at 1201.

Plaintiffs do not allege that Defendants' mere denial of Non-Party Raheel Foods proposed sales was improper interference. The problem, as alleged by Plaintiffs, is that Defendants used their disapproval rights for an improper purpose—to take Plaintiffs' buyers for themselves. These allegations distinguish the present circumstances from *Hornung* and *Blair*. The fact that Defendants had the right to deny the sales proposed by Non-Party Raheel Foods is not fatal to Plaintiffs' claims.

As described in the Second Amended Complaint, Defendants' only motive for their conduct was to increase profits. Defendants argue that their profit motive justifies their conduct because the parties were competitors in the business of operating and selling restaurant franchises and properties. The Court recognizes that "legitimate competition between actors in a market necessarily interferes with prospective business relations" and that, as between competitors, competition alone is not an improper basis for interference. *Ventas*, 635 F. Supp. 2d at 623; Restatement (Second) of Torts § 768 cmt. a. As explained above in the context of the J.A. transaction, however, Plaintiffs claim they could not sell their franchises and underlying properties in a package deal without Defendants' approval of the sales submitted by Non-Party Raheel Foods. Because Defendants were privy to the terms of the deals and allegedly used its contractual rights to handcuff Plaintiffs and purloin their potential purchasers, the claims here are distinguishable from those cited by Defendants involving ordinary competition. *See, e.g.*, *Brake*

10

*Parts, Inc. v. Lewis*, Nos. 09-132-KSF, 10-212-KSF, 2011 WL 42973, at *1-3 (E.D. Ky. Jan. 6, 2011).

Viewing the parties as competitors, the question would be whether Defendants' competition "[c]rossed the line between competition that is proper and that which is improper." *Ventas*, 635 F. Supp. 2d at 623. Defendants insist that, if the parties are competitors, Plaintiffs must plead "unlawful means, such as fraud, deceit, or coercion," or their claim fails. Kentucky law, however, is not so limited. Indeed, none of the cases cited by Defendants hold that a plaintiff must make such allegations when the parties are competitors.[2] Moreover, the Sixth Circuit's holding in *Ventas* undermines Defendants' position. As noted above, besides recognizing that Kentucky has not expressly adopted Section 768, the *Ventas* court noted that

---

[2] Yum cites *Brake Parts*, 2011 WL 42973, at *2-3; *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 717 (6th Cir. 2005); and *AMC of Louisville*, 2000 WL 33975582, at *6-8, as support. *In Brake Parts*, the court held that the plaintiff failed to establish a prima facie case of intentional interference with prospective business relations because it had not alleged "malice or bad faith, deception or wrongful acts without legal justification or excuse to proceed." *Brake Parts*, 2011 WL 42973, at *3. The court nowhere stated that the plaintiff had to plead unlawful means such as fraud, deceit, or coercion. In *ATC Distribution Group*, the Sixth Circuit affirmed the district court's holding that none of the defendants' behavior had risen to the level of intentional interference with business relations. *ATC Distrib. Grp.*, 402 F.3d at 717. The district court applied the seven factors outlined in Section 767 of the Restatement (Second) of Torts in reaching its conclusion. *Id.* The Sixth Circuit quoted *Steelvest*, in part, for the proposition that in Kentucky "tort liability exists for the interference with a known contractual relationship, if the interference is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion." *Id.* (internal quotation marks omitted) (citation omitted). In *AMC of Louisville*, the court quoted two cases pre-*Hornung* for the proposition that "state and federal courts have noted that 'no action lies in Kentucky for [tortious interference] unless the inter-meddler employs unlawful means, such as fraud, deceit or coercion.'" *AMC of Louisville*, 2000 WL 33975582, at *6 (alteration in original) (quoting *Henkin, Inc v. Berea Bank & Tr. Co.*, 566 S.W.2d 420, 425 (Ky. App. 1978)). In the same paragraph, however, the court noted that "[u]nless the interference is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion, impropriety does not exist." *Id.* (internal quotation marks omitted) (quoting *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991)). In sum, these cases do not stand for the proposition that a plaintiff *must* plead unlawful means such as fraud, deceit, or coercion when the parties are competitors to avoid dismissal of its claims.

11

Section 768 does not define "wrongful means," and held that it was proper for the district court to look at Section 767 to illuminate the meaning of the phrase. *Ventas*, 647 F.3d at 309-10.[3] Pleading fraud, deceit, or coercion is not the only way to establish a prima facie case of intentional interference with prospective economic advantage. *See Ventas*, 635 F. Supp. 2d at 622. Based on the facts alleged in the Second Amended Complaint, Plaintiffs have sufficiently pled a claim against Defendants for intentional interference with a prospective economic advantage.

### 2. *Negligent Interference with Prospective Economic Advantage*

Plaintiffs concede that Kentucky law does not recognize a cause of action for negligent interference with prospective economic advantage. Rather, they seek leave to amend the Second Amended Complaint to add a traditional negligence claim. Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend shall be given when justice so requires. A motion to amend may be denied, however, where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, *futility of amendment*, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (emphasis added). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010).

Plaintiffs argue that a negligence claim is proper under the facts alleged. They cite *T&M Jewelry, Inc. v. Hicks*, 189 S.W.3d 526 (Ky. 2006) for the proposition that Kentucky "has adopted a universal duty of care which requires every person to exercise ordinary care in his

---

[3] The jury instruction challenged in *Ventas* provided that, because the parties were competitors, the jury had to find that the defendant employed "significantly wrongful means" to find for the plaintiff. *Ventas*, 647 F.2d at 307. For purposes of the instruction, the court merely noted that "significantly wrongful means" *included* fraud, deceit or coercion. *Id.* at 308.

activities to prevent foreseeable injury." *Id.* at 530. In that same opinion, however, the court recognized that "the universal duty of care is not boundless." *Id.* at 531. Moreover, subsequent cases have held that "despite its value as a catch phrase, the universal duty of care has no meaning in Kentucky jurisprudence beyond the most general expression of negligence theory, and certainly none absent a relational context as evidenced by the circumstances of each case." *Jenkins v. Best*, 250 S.W.3d 680, 691 (Ky. App. 2007) (citation omitted). Indeed, as one court has explained, the phrase is "cited often by parties advocating a theory of liability or a cause of action where none previously existed and legal authority is otherwise lacking." *James v. Wilson*, 95 S.W.3d 875, 891 (Ky. App. 2002).

Plaintiffs appear to be doing exactly as *James* suggested. They argue that Defendants had a duty of care under Kentucky law "not to use the information received from their franchisees regarding purchase transactions to derail those transactions for their economic benefit." (Pls.' Opp'n 15). However, they have cited no authority supporting the imposition of such duty beyond the general proposition found in *T&M Jewelry*. *See Jenkins*, 250 S.W.3d at 689 ("We are convinced that our courts never intended their recent references to 'universal duty' as establishing a principle whereby a plaintiff could satisfy the first element of a cause of action for negligence . . . by mere citation [of the phrase]."); *Estate of Vosnick v. RRJC, Inc.*, 225 F. Supp. 2d 737, 740 (E.D. Ky. 2002) (stating that the universal duty of care "is most emphatically *not* a jurisdictional panacea for litigants faced with an uphill challenge in establishing the existence of a legal duty of care."). Because Plaintiffs have failed to establish that Defendants owed them a duty of care recognized under Kentucky law, Plaintiffs' request for leave to amend is denied. Any amendment would be futile; the facts pled do not support a negligence claim, and the Plaintiffs have failed to explain what additional facts could be pled to change that conclusion.

13

### 3. *Unfair Competition*

In *Covington Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135 (Ky. 1969), Kentucky's highest court defined unfair competition as "either (1) injuring the plaintiff by taking his business or impairing his good will, or (2) unfairly profiting by the use of the plaintiff's name, or a similar one, in exploiting his good will." *Id.* at 139. The court further noted that "[u]nderlying the whole theory is the matter of actual or intended deception of the public for business reasons." *Id.* (citation omitted). After reviewing a number of prior cases involving the doctrine, the court emphasized that "the intent to deceive is the gravamen of the offense in all cases of this character." *Id.* (internal quotation marks omitted) (quoting *Kay Jewelry Co. v. Gay's Jewelry*, 277 S.W.2d 30, 33 (Ky. 1955)).

Plaintiffs have failed to allege that Defendants deceived the public or intended to deceive the public, which is fatal to their claim. True, the "the common law doctrine of unfair competition . . . has been expanded to meet many varying types of business conditions," but that does not mean it applies here. *Id.* at 137. Plaintiffs have not identified, and the Court is unable to find, a single Kentucky case holding that actions like Defendants' constitute unfair competition. *See Kenney v. Hanger Prosthetics & Orthotics, Inc.*, 269 S.W.3d 866, 871 (Ky. App. 2007). For example, all of the cases the *Covington Inn* court addressed in reaching its definition of unfair competition involved one party alleging that another party was using a similar name with the intent to deceive the public. *See Covington Inn*, 445 S.W.2d at 138-39. In fact, courts in this district have twice stated that "Kentucky has only recognized the claim of unfair competition in the realm of trademarks . . . ." *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 789-90 (W.D. Ky. 2001) (citation omitted); *Cmty. Ties of Am., Inc. v.*

*NDT Care Servs., LLC*, No. 3:12-CV-00429-CRS, 2015 U.S. Dist. LEXIS 14990, at *50 (W.D. Ky. Feb. 9, 2015) (citation omitted). [4]

Plaintiffs' arguments to the contrary are unpersuasive. Plaintiffs maintain that unfair competition applies where there is "some competitive aspect" between the parties, and the defendant acts "unfairly in a manner which invades the plaintiffs protected rights." (Pls.' Opp'n 18-19). They contend their claim is sufficiently pled because Defendants acted unfairly by improperly interfering in their prospective business relations, which harmed their protected right to conduct their businesses. The language quoted by Plaintiffs—albeit out of context—does come from *Covington Inn*. *See Covington Inn*, 445 S.W.2d at 138. Moreover, the *Covington Inn* court did note that one form of unfair competition is "injuring the plaintiff by taking his business . . . ." *Id.* at 139. This clause however, cannot be read in isolation. The opinion as a whole does not support Plaintiffs' broad conception of unfair competition because it makes clear that actual or intended deception of the public is an "essential element" of the tort. *See id.* at 139. Indeed, if this Court were to accept Plaintiff's view, it would be hard to say how the claim differed from one of intentional interference with prospective economic advantage.

The UCL is also inapplicable. Plaintiffs have recognized that Kentucky law applies; thus, an unfair competition claim based on a California statute has no place here. *See Cannon v. Wells Fargo Bank, N.A.*, 917 F. Supp. 2d 1025, 1055 (N.D. Cal 2013) ("As a preliminary matter, the Court notes that . . . Florida law governs, not California law, and therefore the [UCL claim] is dismissed on that basis alone."). Regardless, Plaintiff's UCL claim is without merit because

---

[4] While this Court, in light of *Covington Inn*, is not convinced that the doctrine of unfair competition is categorically limited to the "realm of trademarks," it does appear that most, if not all, cases applying the doctrine involve the allegation that one party is using another party's trademark with the intent to deceive the public. Thus, while it is unclear exactly how far the doctrine extends past trademarks, it is clear that it does not apply here.

15

"California's Supreme Court has made clear that there is a strong presumption against the extra-territorial application of California law." *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1129 (N.D. Cal. 2014). In *Sullivan v. Oracle*, 254 P.3d 237 (Cal. 2011), the California Supreme Court explicitly held that this presumption applies to the UCL. *Id.* at 248. In doing so, it noted that "[n]either the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially," and concluded that the presumption against extraterritoriality "applies to the UCL in full force." *Id.*

It is well settled that non-California residents cannot bring UCL claims for wrongful conduct occurring outside California. *Norwest Mortg., Inc. v. Superior Court*, 85 Cal. Rptr. 2d 18, 23 (Cal. Ct. App. 1999); *Accord Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1096-97 (C.D. Cal. 2015); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 916-17 (C.D. Cal. 2011); *Churchill Vill., LLC v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1126-27 (N.D. Cal. 2000). "In determining whether the UCL . . . appl[ies] to non-California residents, courts consider where the defendant does business, whether the defendants principal offices are located in California, . . . and the location from which [the relevant] decisions were made." *In re Toyota*, 785 F. Supp. 2d at 917. Moreover, a plaintiff must forward sufficient facts showing that it is "plausible" that the alleged wrongful conduct emanated from California; conclusory allegations are insufficient. *See Cannon*, 917 F. Supp. 2d at 1056 (citations omitted).

Plaintiffs are Arkansas, Illinois, and Florida business entities that do not conduct business in California. Plaintiffs' only connection to California is that they are managed primarily from California by Raheel. From this alone, they contend that their injury was sustained, at least in part, in California. Raheel, however, is not a party to this lawsuit. Meanwhile, Defendants are Delaware and North Carolina corporations with headquarters in Kentucky. Plaintiffs allege that

16

all transactions relating to their attempts to sell their respective franchises and property, including interfacing with Yum corporate personnel, occurred in California. (2d Am. Compl. ¶¶ 8-12). Such a conclusory allegation is insufficient because it is unsupported by any facts indicting the business decisions at issue emanated from California. To the contrary, Defendants' allegedly unlawful and unfair conduct appears to have emanated from outside of California, especially in light of the fact that Defendants' principal offices are located in Kentucky.[5]

Plaintiffs also argue their UCL claim survives because they have alleged Defendants own real estate in California and operate corporate-owned franchisees in California. Plaintiffs fail, however, to plead any connection between Defendants' California operations and Plaintiffs' UCL claims regarding its franchises in Illinois, Florida, Wisconsin, and Indiana. *Cannon,* 917 F. Supp. 2d at 1055 ("[T]he question is whether [defendant's] connection with California is enough to give rise to Plaintiffs' [UCL] claim."); *In re Toyota*, 785 F. Supp. 2d at 917 n.26 (explaining that "[a]lthough the Toyota Defendants have significant connections with California, Plaintiffs have not alleged that [relevant] marketing decisions were made in California); *Churchill Vill.*, 169 F. Supp. 2d at 1126-27 (finding that a defendant's in-state sales were insufficient to establish a nexus with California to support a UCL claim.). Therefore, aside from the fact that Plaintiffs' UCL claim should be dismissed because Kentucky law—not California law—applies here,

---

[5] *See Gustafson v. BAC Home Loans Servicing, LP*, No. SACV 11-915-JST (ANx), 2012 U.S. Dist. LEXIS 117493, at *15 (C.D. Cal. Apr. 12, 2012) (concluding that plaintiff's allegation that defendants' scheme was devised, implemented, and directed from their offices in California was too conclusory and noting that "mere possibility that certain decisions related to [defendants'] policies and practices . . . may have been made in California does not, standing alone, justify application of the UCL to Plaintiff's claims"); *Warner v. Tinder Inc.*, 105 F. Supp. 3d at 1097 ("Because [plaintiff] does not adequately allege whether decisions concerning [defendant's] business practices . . . emanated from California, and does not plead facts demonstrating that this is so, his UCL claim fails.").

Plaintiffs' UCL claim also fails because their allegations are insufficient to overcome the presumption against its extraterritorial application.

### 4. *Piercing the Corporate Veil*

Although Plaintiffs contend that Yum is directly liable for its wrongful conduct, they ask the court to pierce the corporate veil of KFC and hold Yum liable as its alter ego. Recently, the Kentucky Supreme Court explained the equitable doctrine of piercing the corporate veil:

> Piercing the corporate veil is an equitable doctrine invoked by courts to allow a creditor recourse against the shareholders of a corporation. In short, the limited liability which is the hallmark of a corporation is disregarded and the debt of the pierced entity becomes enforceable against those who have exercised dominion over the corporation to the point that it has no real separate existence. A successful veil-piercing claim requires both this element of domination and circumstances in which continued recognition of the corporation as a separate entity would sanction a fraud or promote injustice.

*Inter-Tel Techs., Inc. v. Linn Station Props., LLC*, 360 S.W.3d 152, 155 (Ky. 2012). Under *Inter-Tel Technologies*, a court proceeding under the alter-ego theory must resolve two dispositive elements before piercing the corporate veil: "(1) domination of the corporation resulting in a loss of corporate separateness and (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Id.* at 165.

Plaintiffs allege that Yum "had a unity of interest in ownership between itself and KFC, such that the individuality and separateness between them ceased and KFC was the alter ego of Yum[,]" and that Yum "controlled, dominated, managed and operated KFC as its alter ego, including by controlling and directing KFC's unreasonable refusal to approve the sale of its franchises . . . in order to further its aggressive campaign to sell its corporate owned stores." (2d Am. Compl. ¶ 17). Plaintiff further alleges that, on information and belief, Yum "was and is the beneficial owner of KFC and KFC was and is a mere shell, instrumentality, and conduit through

which [Yum] carried on its business"; "corporate formalities have been disregarded"; and, that "the individuality of KFC is a sham and fiction." (2d Am. Compl. ¶ 17).

The facts alleged by Plaintiffs in the Second Amended Complaint, even if true, do not meet the standards for piercing the corporate veil because they do not demonstrate that KFC is the alter ego of its shareholder, Yum. "Ownership and control of a corporate entity by the persons sought to be held liable . . . is not sufficient by itself for denial of entity treatment." *Poyner v. Lear Siegler, Inc.*, 542 F.2d 955, 958 (6th Cir. 1976) (citing *C.L. & L. Motor Express Co. v. Achenback*, 82 S.W.2d 335 (Ky. 1935)). Plaintiffs' bald assertions are insufficient to state a claim. *See Johnson v. Diamond Shine, Inc.*, 890 F. Supp.2d 763, 774 (W.D. Ky. 2012) (citing *Se. Texas Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 678 (6th Cir. 2006)).

Additionally, Plaintiffs piercing-the-corporate-veil claim fails because the facts alleged do not demonstrate that continued recognition of the corporation would sanction fraud or promote injustice. In *Inter-Tel Technologies*, the Kentucky Supreme Court recognized several scenarios sufficient to satisfy the "promoting injustice" factor. *Inter-Tel Techs*, 360 S.W.3d at 167-68. One example involves a parent corporation causing a subsidiary's liability and then rendering the subsidiary unable to pay the liability. *Id.* Another example involves "an intentional scheme to squirrel assets into liability-free corporations while heaping liabilities upon an asset-free corporation." *Id.* at 168 (internal quotation marks omitted) (citation omitted).

No such allegations have been made here. Plaintiffs do not contend that Yum is using KFC's limited liability to injure Plaintiffs and avoid liability itself, or that KFC is without assets to satisfy judgments entered against it. Moreover, Plaintiffs maintain that Yum is directly liable for its active participation in the alleged wrongdoing. Overall, Plaintiffs have not adequately pled a legal or factual basis for application of the piercing-the-corporate-veil doctrine.

### 5. *Leave to Amend*

Plaintiffs request that, in the event the Court grants any portion of Defendants' Motion to Dismiss, they be granted leave to amend. Plaintiffs contend that leave to amend is proper because their claims were initially pled under California law, but now the parties agree that Kentucky law applies. They note that Defendants would not be prejudiced by the amendment because it would be based on the same facts that gave rise to Plaintiffs' lawsuit. As noted above, however, the futility of a proposed amendment provides a basis for denying it. *Foman*, 371 U.S. at 182; *Riverview Health Inst.*, 601 F.3d at 520. Considering that Plaintiffs have stated that the amendment would be based on the same facts that gave rise to their lawsuit, the amendment would not change the above conclusions. (Pls.' Opp'n 24). Therefore, Plaintiffs' request is denied.

### V. CONCLUSION

For the reasons above, Defendants' Renewed Motion to Dismiss for Failure to State a Claim (DN 32) is **DENIED** as to Plaintiffs' claim for intentional interference with prospective economic advantage but **GRANTED** as to the remainder of Plaintiffs' claims. Plaintiffs' request for leave to amend is **DENIED**.

**Greg N. Stivers, Judge**
**United States District Court**
January 18, 2017

cc: counsel of record